**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| DEBRA WALTON, ) | |
| ) | CASE NO.   4:11-cv-741 |
| Plaintiff, ) | |
| ) | |
| v. ) | MAGISTRATE JUDGE VECCHIARELLI |
| ) | |
| COMMISSIONER OF SOCIAL ) | |
| SECURITY, ) | |
| ) | MEMORANDUM OF OPINION |
| Defendant. ) | |

This case is before the magistrate judge by consent.  Plaintiff, Debra Walton ("Walton"), challenges the final decision of the Commissioner of Social Security, Michael J. Astrue ("Commissioner"), denying Walton's application for a period of Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), and for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 423 and 1381(a).   This court has jurisdiction pursuant to 42 U.S.C. § 405(g).

For the reasons set forth below, the court REVERSES the opinion of the Commissioner and REMANDS the case for further proceedings.

I.  Procedural History

Walton filed applications for DIB and SSI on August 17, 2007, alleging disability as of January 12, 2007.  Her applications were denied initially and upon reconsideration. Walton timely requested an administrative hearing.

Administrative Law Judge J.E. Sullivan ("ALJ") held a hearing on September 2, 2009. Walton, represented by counsel, testified on her own behalf at the hearing. Larry Ostrowski testified as a vocational expert ("VE"). The ALJ issued a decision on October 26, 2009, in which he determined that Walton is not disabled. Walton requested a review of the ALJ's decision by the Appeals Council. When the Appeals Council declined further review on March 4, 2011, the ALJ's decision became the final decision of the Commissioner.

Walton filed an appeal to this court on April 15, 2011. Walton alleges that the ALJ's opinion was not supported by substantial evidence because (1) the ALJ did not have the opportunity to evaluate the exhibit submitted to the Appeals Counsel, and (2) the ALJ did not articulate a valid argument for finding Walton not to be credible. The Commissioner denies that the ALJ erred.

## II. Evidence

*A.  Personal and Vocational Evidence*

Walton was born on June 2, 1958 and was 51 years old at the time of her hearing. During the hearing, Walton amended her onset date to June 12, 2007. Walton graduated high school and has past relevant work as a bank teller, an insurance agent, a secretary/substitute at an elementary school, and a secretary/agent at an insurance company. She is insured for benefits through December 31, 2011.

*B.  Medical Evidence*

Walter was tentatively diagnosed with multiple sclerosis ("MS") in about May 2007. Her primary physician, Lori Crowl, M.D., referred her to John C. Andrefsky, M.D., a neurologist, for a specialist's opinion. Tr. at 240-43. Dr. Andrefsky saw Walton on

2

about June 12, 2007. Walton complained of double vision, a weak left eye, problems walking, joint pain, depression, and memory loss. Upon examining a recent MRI, Dr. Andrefsky found it to be consistent with MS. A physical examination revealed a mildly spastic gait but no other neurological or muscular abnormalities. Dr. Andrefsky ordered additional MRI's of the brain, cervical spine, and thoracic spine. The MRI of the thoracic spine was normal, while the cervical spine showed some degenerative narrowing at C5 but no other abnormalities. The brain study revealed demyelination, diffuse microangiopathy, and a small focal plaque in the left cerebellar peduncle.

Walton visited Dr. Andrefsky again in mid-July 2007. Tr. at 236-37. Dr. Andrefsky found that the brain MRI, Walton's history, and her symptoms to be consistent with MS. Walton reported an incident of light facial numbness that lasted for a week. She also reported that Solu-Medrol had resolved her double vision and improved her speech, but she was still shaky on her feet. Dr. Andrefsky found no neurological or motor deficits. Walton's gait, however, was widely based and mildly spastic. Dr. Andrefsky discussed the possibility of Walton's entering a research trial for patients with MS. He also recommended that she seek a second opinion and recommended long-term treatment.

On August 8, 2007, James D. Burkholder, M.D., a neurologist, examined Walter upon referral from Dr. Andrefsky. Tr. at 234-35. Walton reported to Dr. Burkholder that she began experiencing double vision in early July of 2007 and also experienced some disconjugate vision and facial numbness. She also reported that after taking Solu-Medrol her double vision was gone. Walton's husband told Dr. Burkholder that Walton began experiencing problems with stumbling and veering to the right as early as

3

January or February 2007 and that Walton became somewhat more forgetful in March or April of that year.  Upon examination , Dr. Burkolder found a bit of clumsiness in the left arm in executing rapid alternating movements, spasticity in the legs bilaterally, an abnormally wide gait, and an inability to walk tandemly.  From the result's of Walton's MRI's, Walton's reports, and an office examination, Dr. Burkholder confirmed the diagnosis of MS.  He discussed treatment options with Walton and her husband.

On August 20, 2007, Walton again visited Dr. Andrefsky.  Tr. at 231-32. Walton reported that her gait and balance were still abnormal but that she had improved since her first visit with Dr. Andrefsky.  A neurological and motor examination revealed no abnormalities, with the exception that Walton's gait was slow, mildly unsteady, and mildly spastic.  Dr. Andrefsky again discussed treatment options with Walton and her husband.  The following day, Walton discussed with Fran Duszinski ("Duszinski"), R.N., the possibility of participating in a clinical study as part of her treatment.  Tr. at 233.

On September 24, 2007, Dr. Andrefsky examined Walton again and found her condition to be stable.  Tr. at 229-30.  Walton expressed a willingness to enroll in the clinical study, and she was introduced to the study on November 12, 2007.  Tr. at 266.

Walton visited Dr. Burkholder on November 27, 2007 complaining of increasing leg weakness, weakness and tingling in the right hand, and lack of coordination shortly after taking the drug given in the clinical trial, Copaxone.  Tr. at 267, 265.  This caused great difficulty walking, although the symptoms disappeared the next day.  When she stopped taking Copaxone, the symptoms disappeared.  An examination revealed that Walton's condition was stable.  Dr. Burkholder concluded that the new symptoms were a side effect of the Copaxone.  He recommended starting the drug again at half the

4

dosage but taking it at bedtime. In December, Walton reported to Duszinski that the new symptoms had not reoccurred, and she was able to walk without assistance despite an ataxic gait. Tr. at 268.

On January 14, 2008, state agency physician, Jeffrey Vasiloff, M.D., completed a Physical Residual Functional Capacity ("RFC") Assessment of Walton. Tr. at 251-58. Dr. Vasiloff concluded that Walton could lift or carry 20 pounds occasionally and 10 pounds frequently, could stand or walk about six hours in an eight-hour workday, sit about six hours in an eight-hour workday, and had no limitations in her ability to push or pull. He also opined that Walton could only occasionally climb ramps or stairs, stoop, kneel, crouch, or crawl and could never climb ladders, ropes, or scaffolds. He also believed that Walton should avoid even moderate exposure to hazards. Dr. Vasiloff did not complete the portion of the assessment addressing balancing. Otherwise, he found no physical functional limitations. Dr. Vasiloff also wrote that Walton's statements were only partially credible, although he did not explain to which statements he was referring or why he discounted their credibility.

On March 11, 2008, Duszynski noted that Walton's condition was unchanged since December 2007 and that Walton had experienced no further problems with the Copaxone. Tr. at 264.

Walton began undergoing physical therapy in late July 2008. Tr. at 330-31. Walton told her therapist that she had difficulty going up and down stairs and had to use the handrail for support. She also said that she was easily fatigued and that her balance while walking was a problem, especially when she was fatigued. Strength in upper extremities and range of motion were normal or near normal, and Walton had no

complaints about pain. Therapy goals included increasing strength in lower extremities and improving balance, gait, and ability to go up and down stairs. On August 28, 2008, Walton was discharged from therapy to a home exercise program. Tr. at 332. The therapist noted that she had increased strength in her lower extremities, improved her balance and gait, was more steady on her feet, and had greater gait endurance. Therapy notes indicate, however, that Walton had continuing problems with fatigue. Tr. at 333-34.

An MRI of Walton's brain, conducted in November 2008, showed no significant change in Walton's condition. Tr. at 294.

On May 28, 2009, W. Jerry McCloud, M.D., reviewed Walton's medical record and affirmed Dr. Vasiloff's estimate of Walton's RFC. Tr. at 290. Dr. McCloud agreed that Walton was only partially credible. Again, the state agency physician failed to explain which statements he found not to be credible and why. Dr. McCloud's opinion reads in its entirety as follows:

> There is no new medical since the prior decision that would alter the 1/14/08 RFC. Dr. Vasiloff feels that the severity of the claimant's allegations are only partially credible and there is medical support for that opinion. Dr. Andrefsky at the Neurocare Center reports a reasonably normal physical evaluation with the exception of something of an unsteady gait. The brain MRI completed at the Salem Community Hospital does show lesions in the parietal lobe but the MRIs of the cervical and thoracic areas are normal. Visual deficiency is not supported by evaluations by Dr. Kuhn as the claimant has visual acuity that is corrected to 20/20. Affirming the RFC.

Tr. at 290.

*C. Hearing testimony*

The ALJ held a hearing on September 2, 2009 at which Walton and a VE testified. Tr. at 24-65. Walton testified that her major complaint was fatigue from

6

walking and dragging her right foot. Tr. at 34. Walton also testified that she did basic housework. Tr. at 38. According to Walton, she usually cooks, does very little laundry, vacuums for about 15 minutes at a time, and cleans the kitchen after dinner. Tr. at 35, 51. According to Walton, she hardly ever shops for groceries, and she is unable to walk more than 50 feet without becoming fatigued. Tr. at 36-37. When her husband painted the house, she helped carry supplies to him. Tr. at 38. In general, she becomes much more fatigued than previously. Tr. at 35. Walton also testified that she is less tired in the morning, but by the afternoon she feels extremely fatigued. In particular, her right arm becomes very tired and she is less able to use her right hand until she loses the use of it. Tr. at 37.

Walton testified that she and her husband do not socialize very much, although they occasionally go to the movies or to the Cavelli Center for a concert. Tr. at 51. She also drives short distances. Tr. at 52.

Walton told the court that she had been told to stop taking Copaxone pending her examination by a new neurologist. Tr. at 38. She said that since she had stopped taking the drug, her symptoms had worsened. *Id.*

Walton had difficulty remembering dates during her testimony. She also testified that she had not been treated since November 2008, although records indicated that she had taken Copaxone up to April 2009.

The VE identified and characterized Walton's past relevant work as follows: bank teller, light and skilled; secretary, sedentary and skilled; receptionist, sedentary and semi-skilled; insurance sales agent, light and skilled, although sedentary and skilled as Walton performed it. Tr. at 53-54. According to the VE, the skills demonstrated or

7

acquired by Walton in these jobs included typing, use of a keyboard, preparing communication, time management, accounting principles, balancing books, counting money, communication skills, and assessing clients' insurance needs.  Tr. at 54-57.

The ALJ asked the VE four hypothetical questions.  First, he asked the VE to assume an individual capable of light work and who could lift or carry no more than 20 pounds occasionally and 10 pounds frequently; who could stand/walk no more than six hours in an eight-hour day or sit for six hours in an eight-hour day, both with normal breaks; unable to climb ladders, ropes, or scaffolds; occasionally able to climb ramps and stairs, balance, stoop, kneel, crouch; and able to climb ladders, ropes, or scaffolds and crawl; must avoid moving machinery and unprotected heights.  The VE testified that such an individual could perform all of Walton's past work.  He also testified that such an individual could perform such unskilled jobs as office helper, marker, and mail clerk.

For the second question, the ALJ asked the VE to assume the same individual already described but who would need a cane or other assistive walking device when ambulating away from the work station.  The VE testified that such an individual could perform all of Walton's past relevant work but could not perform the unskilled jobs mentioned as alternatives.  She would, however, be able to perform such other unskilled jobs as storage facility rental clerk, parking lot attendant, and telephone information clerk.

Third, the ALJ asked the VE to assume the individual described in the second hypothetical but also assume that the individual could not function beyond the sedentary level rather than the light level of exertion.  The VE testified that such asn individual could perform Walton's past relevant work as a secretary and receptionist and as an

insurance sales agent as Walton performed it. The VE further testified that such an individual could also perform the jobs of charge account clerk, telephone quotation clerk, and document preparer.

Finally, the ALJ asked the VE to assume that all Walton's testimony given at the hearing that day were credible with respect to her pain and functional limitations, including foot-dragging, an inability to walk more than 50 feet before becoming fatigued, and an inability to use her right arm and fingers on a daily basis. The VE testified that there were no jobs that such an individual could perform.

*D. Post-Hearing Medical Evidence*

On September 9, 2009, Walter reported to the Center for Multiple Sclerosis, Neurology and Neuroscience Associates, Inc. in Akron, Ohio ("the Center") upon referral from Dr. Burkholder. Tr. at 341-46. Walton reported to the attending physician, Dr. DeRen Huang, M.D., Ph.D., worsening symptoms, including a decreased ability to use her hands and a decrease in the distance she could walk. The clinical notes state that her last dose of Copaxone was April 13, 2009. Walton also told Dr. Huang that her vision was generally normal with episodes of blurred vision; that she had mild weakness in both legs and in her right hand; that she suffered no spasticity but did experience rare occasional spasms; and that she did not suffer tremors but did have moderate to severe ataxia. These symptoms affected her activities of daily living only insofar as she had decreased strength and greater trouble balancing. Tests produced normal results except that Walton's coordination was poor and ataxic and she had an unstable, ataxic gait. Dr. Huang ordered an MRI of the brain and cervical spine.

Walter visited the Center again on September 21, 2009 to begin five days of

Solumedrol injection.  Tr. at 347-49.  On September 23, 2009, she was also screened at the Center preliminary to entering another treatment study for MS.  Tr. at 350-55.  A review of the results of her MRIs on September 15, 2009 revealed extensive parenchymal signal changes consistent with multiple sclerosis and suggestions of demyelination in the upper cervical spine.

On October 9, 2010, Walton underwent a long series of tests and interviews to determine her RFC.  Tr. at 359-71.  Walton primarily reported fatigue when standing or walking for any period of time, and she also described some difficulties with cognition.  The results of the tests and self-reports indicated that Walton was limited to work at the sedentary level and that she had trouble balancing and with sustained dexterity and maintenance of work pace.  The tester opined that Walton's reports of pain and disability were fully reliable.  Based on these results, on November 18, 2010 Dr. Huang opined that Walton met Listing 11.09 for MS.  Tr. at 358.

### III.  Standard for Disability

A claimant is entitled to receive benefits under the Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled

by way of a five-stage process.  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time he seeks disability benefits.  Second,  the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities."  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000).  Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled.  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

IV.  Summary of Commissioner's Decision

In determining that Walton was not disabled, the ALJ made the following relevant findings:

3. The claimant has the following severe impairments:  multiple sclerosis, osteoporosis.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. §§ 404.1567(b), performing all postural limitations occasionally, except never climbing ladders, ropes or scaffolds; and

11

       avoiding even moderate exposure to workplace hazards, such as dangerous moving machinery and unprotected heights.

6. The claimant is capable of performing her past relevant work as a bank teller, secretary, receptionist, and an indurance sales agent.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity.

7. The claimant has not been under a disability, as defined in the Social Security Act, from June 12, 2007 through the date of this decision.

Tr. at 15-20.

## V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the administrative law judge's findings of fact and whether the correct legal standards were applied.  *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

## VI.  Analysis

Walton argues that the ALJ's opinion was not supported by substantial evidence because (1) the ALJ did not have the opportunity to evaluate the exhibit submitted to the Appeals Counsel, and (2) the ALJ did not articulate a valid argument for finding Walton

not to be credible.  The Commissioner denies that the ALJ erred.

A.  *Whether the ALJ's opinion is not supported by substantial evidence because the ALJ did not have an opportunity to examine the exhibit submitted to the Appeals Council*

Walton argues that the ALJ's opinion is not supported by substantial evidence because the ALJ did not have an opportunity to examine the evidence derived from medical treatment after the September 2, 2009 hearing.  Such evidence includes Dr. Huang's September 9, 2009 examination of Walton, clinical notes related to Walton's Solumedrol injections and screening for participation in a second study, and the testing of Walton's RFC in October 2010 along with Dr. Huang's November 2010 opinion that Walton met Listing 11.09 for MS.  Tr. at 341-71.  Walton contends that the ALJ's failure to consider this evidence justifies remanding the case to the ALJ pursuant to sentence six of 42 U.S.C. § 405(g) ("§ 405(g)").  The Commissioner responds that the court should not remand or consider such evidence because (1) some of the evidence was not new; (2) Walton has not shown good cause for the failure to present the evidence to the ALJ; and (3) the evidence is not material.

Sentence six of § 405 (g) provides in relevant part as follows:  "The court may . . . at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . ."

The Commissioner's contention that some of the evidence was not new is simply wrong.  All of the evidence at pages 341-71 of the transcript was generated after the ALJ's hearing.

13

The Commissioner's contention that Walton should have attempted to provide some of the new evidence to the ALJ is generally not convincing. The Commissioner faults Walton for failing to keep the record open when she knew she was going to see a new neurologist a week after the hearing. But Walton had no reason to believe that results from Dr. Huang would add anything significant to the record in the near term. Walton had stopped taking her medication upon Dr. Huang's orders in order to flush her old medications from her system before beginning a new regimen of medication. At the time of the hearing, Wlaton's new treatment had not started. Thus, Walton could not have expected any significant results from her new course of treatment in the near term and achieved improvements, if any, in her condition. Moreover, looking at the new evidence generated between the hearing and the ALJ's decision, only Walton's MRIs, taken September 15, 2009, might have had any relevance to the ALJ's decision, issued October 26, 2009.

The Commissioner's argument that the new evidence is not material, however, has some merit. This is particularly true of the tests conducted in October 2010, approximately one year after the ALJ's decision, and Dr. Huang's opinion that Walton meets the requirements of Listing 11.09 based on those tests.[1] It is not clear that Walton's condition in October 2010, as described by the tests, is relevant to Walton's condition in September 2009 at the time of the hearing. Walton's condition had

---

[1] The Commissioner's argument that Dr. Huang's opinion is unsupported because he fails to reference the objective tests in his opinion is meritless. The tests were attached to Dr. Huang's opinion. It is no great inference to conclude that the opinion is based on those tests, particularly because the tests provide support for that opinion and because Dr. Huang referred Walton for the tests.

deteriorated at the time of he hearing, and the 2010 tests also describe a deterioration in Walton's condition. But the deterioration at the time of the hearing may well have been the result of Walton's having stopped taking her medications preliminary to a change of prescription. Thus, the October 2010 tests do not necessarily reflect Walton's long-term condition at the time of the hearing.

In light of the passage of a year between the ALJ's denial of Walton's claim and the new tests and Dr. Huang's opinion, a new application for benefits would be a more appropriate course of action than pursuing a remand on the basis of the 2010 tests pursuant to sentence six of 405(g).[2] Nevertheless, because this case must be remanded to the ALJ for other reasons, as described below, the ALJ's attention shall be directed to the new evidence now in the record at pages 341-71 of the transcript for his consideration in conjunction with the other evidence of record.

B.   *Whether the ALJ sufficiently articulated valid reasons for finding Walton not to be credible*

Walton contends that the ALJ failed to consider her statements and other evidence regarding fatigue, Walton's primary complaint, and apparently misconstrued other evidence in concluding that Walton's allegations of fatigue were not credible. The Commissioner denies that the ALJ erred in this respect.

SSR 96-7P provides that when the claimant is found to suffer from a medically determinable impairment that could reasonably be expected to produce the alleged symptoms, the ALJ must make a finding about credibility in the course of evaluating the

---

[2] Walton was insured through 2011. Thus, an application based upon an allegation of disability as of October 2010 would fall within her insured period.

15

intensity, persistence, and functionally limiting effects of the alleged symptoms.  This requires the ALJ "to consider carefully the claimant's statements about symptoms" in conjunction with the rest of the relevant evidence in the record in reaching a conclusion about credibility.  SSR 96-7P, 1996 WL 374186 at *1.  The ALJ is specifically cautioned, "An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence."  1996 WL 374186 at *1.  Moreover, SSR 96-7P provides as follows:

> It is not sufficient for the adjudicator to make a single, conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible."  It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms.  The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

*Id.* at *2.

In finding Walton's not to be entirely credible, the ALJ wrote the following:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

Tr. at 18.  This evaluation is not sufficiently specific to make clear to Walton or this court the weight the ALJ gave to Walton's statements and the reasons for that weight. Moreover, the RFC assessment to which the ALJ refers was flawed because it failed adequately to consider Walton's own statements about fatigue, failed to consider other

16

evidence of fatigue, and did not accurately discuss the record.  In addition, the state agency opinions from which the ALJ apparently drew conclusions about Walton's endurance did not include the evidence in the record most relevant to Walton's fatigue, the notes of her therapy sessions.  *See discussion, infra.*, p. 19.

In her hearing testimony, Walton's primary complaint was about fatigue.  She testified regarding when she became fatigued, the activities that particularly caused fatigue, the times of day when she was most fatigued, and the parts of her body that became most noticeably fatigued.  The ALJ's only description of Walton's testimony with respect to fatigue was that Walton was "experiencing fatigue" and, after describing Walton's other testimony, "[t]he claimant added that she is easily fatigued and takes breaks after 15 minutes when vacuuming."  Tr. at 17.  This perfunctory summation of Walton's testimony does not comport with the ALJ's duty "to consider carefully the claimant's statements about symptoms."

Walton alleged that fatigue appeared after a period of exertion.  Thus, one-shot tests of muscle strength, as were conducted by various examining physicians and at the start of Walton's therapy regimen, were not indicative of the sort of fatigue alleged by Walton.  What *was* relevant to her allegations of fatigue were the notes associated with her therapy sessions in July and August 2008.  Those notes repeatedly stated that Walton experienced fatigue during her sessions.  Indeed, along with problems with balance, this was Walton's primary problem during therapy sessions.  These sessions took place while Walton was still taking Copaxone, so the fatigue described in the notes cannot be attributed to Walton's failure to take medications.  In the ALJ's description of the record of Walton's therapy, he noted several times one-shot strength tests indicating

17

that Walton's muscle strength was normal while entirely ignoring the repeated indications of fatigue in the therapy record.

In addition to ignoring evidence relevant to Walton's alleged symptoms, the ALJ also mistakenly cites the record in an important respect.  In his opinion, the ALJ wrote as follows:  "The claimant . . . testified at the September 2, 2009 hearing that she stopped all multiple sclerosis treatment in July 2008 or at the very latest, in November 2008.  She was now experiencing fatigue and left side weakness." Tr. at 17.  The ALJ also wrote that Walton had "unilaterally" stopped taking all treatment for her condition.  Tr. at 16. But, although Walton did testify at one point that she had stopped taking her medicine in November 2008, she also testified that she stopped taking Copaxone in April 2009 and that she had done so at the request of her neurologist.  Tr. at 38.  Moreover, outpatient clinical notes in the record confirm that she stopped taking Copaxone on April 13, 2009.  *See, e.g.*, tr. at 341, 351.  Thus, the ALJ's conclusion that Walton had unilaterally stopped treating her MS in July or August 2008 was erroneous and was contradicted by the record.  In addition, the ALJ clearly implied that Walton had not previously complained of fatigue and only complained of fatigue at the hearing because she had stopped taking her medication.  As has already been shown, the record does not support this conclusion.  Finally, Walton's persistent confusion in her testimony about when various events occurred, such as when she stopped taking Copaxone, evidenced the memory problems that several doctors and her husband had noted, as documented in the record.  The ALJ did not discuss this confusion and its implications.

Walton's activities of daily living, described in her testimony and summarized by

18

the ALJ, tr. at 17, do not contradict her allegations of fatigue.  Walton stated that she required help to do laundry, could vacuum only for 15 minutes at a time, and rarely went food shopping and leaned on the shopping cart when she did.  She also testified that she prepared dinner from items thawed from the freezer or boiled on the stovetop, or she put hamburgers on the grill.  None of the activities she described required her to be on her feet for any extended period of time.

The ALJ's conclusion that Walton is capable of standing and/or walking for six hours in an eight-hour workday is apparently based on the opinions of the two state agency physicians.  The first agency opinion, from Dr. Vasiloff, was rendered in January 2008, well before Walton's July and August 2008 physical therapy sessions that evidenced her fatigue.  The second agency opinion, by Dr. McCloud in January 2009, notes that there is "no new medical since the prior decision that would alter the 1/14/08 RFC."  Tr. at 290.  In affirming Dr. Vasiloff's conclusions, Dr. McCloud refers only to Dr. Andrefsky's physical evaluation, Walton's brain MRI, and Dr. Kuhn's evaluation of visual acuity.  There is no reference to Walton's therapy sessions or any indication that those were available to Dr. McCloud.  Thus, the basis for Dr. Vasoiloff's and Dr. McCloud's opinions that Walton is capable of standing or walking for six hours in an eight-hour workday is unknown, and evidence that would have contradicted such an opinion was either not available or not cited.  There is no other evidence in the record that would support the ALJ's conclusion that Walton is capable of walking or standing for six hours in an eight-hour workday.

For the reasons given above, substantial evidence does not support the ALJ's determination that Walton is capable of standing or walking for six hours in an eight-

19

hour workday and does not support the ALJ's determination that Walton's statements are not credible with respect to her allegations of fatigue.  This case must be remanded to the ALJ, therefore, for him to re-examine the evidence in the record regarding the credibility of Walton's allegations of fatigue and reassess her RFC in light of his re-examination of her credibility.

## VII.  Conclusion

For the reasons described above, the court REVERSES the opinion of the Commissioner and REMANDS the case for further proceedings.  Upon remand, the ALJ shall re-evaluate his determinations regarding Walton's RFC and credibility.  In conducting this re-evaluation, the ALJ shall consider, in conjunction with other evidence in the record, the new evidence at pages 341-71 of the transcript and the court's opinion with respect to the ALJ's previous assessment of Walton's credibility.

**IT IS SO ORDERED.**

Date:  March 16, 2012                    s/ *Nancy A. Vecchiarelli*
                                         Nancy A. Vecchiarelli
                                         U.S. Magistrate Judge